## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 06 2018, 5:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Julianne L. Fox
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:

D.K. (Minor Child),

And

M.S. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

September 6, 2018

Court of Appeals Cause No.
18A-JT-982

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

The Honorable Renee A. Ferguson, Magistrate

Trial Court Cause No. 82D04-1709-JT-1754

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, M.S. (Mother), appeals the involuntary termination of her parental rights to her minor child, D.K. (the Child).

We affirm.

## ISSUE

Mother raises two issues on appeal, which we consolidate and restate as the following single issue: Whether the Indiana Department of Child Services (DCS) presented clear and convincing evidence to support the termination of her parental rights.

## FACTS AND PROCEDURAL HISTORY

Mother and Father (M.K.)[1], are the biological parents of the Child, born on February 8, 2011. At the time the Child was born, Mother and Father were married. Mother also has another younger child from another relationship, E.B., born on September 9, 2012.[2] Mother and the Child live in Evansville,

---

[1] Father's parental rights were terminated at the same time as Mother's; however, Father is not participating in this appeal, but facts pertaining to Father are included where appropriate.

[2] E.B. is not subject to this appeal and is currently under the legal guardianship of his paternal grandfather.

Indiana. Father is an "over the road truck driver," and resides in New Haven, Illinois. (Exh. Addendum p. 74). Whenever Father was in town, he would visit the Child.

[5] The Child initially became involved with DCS of Vanderburg County in 2011 when Mother and Father got into an argument. During the altercation, Mother and Father were in separate vehicles and Father rammed his vehicle into Mother's car. The Child was a passenger in Father's vehicle. Father was later charged with neglect of a dependent.

[6] Based on the altercation and Father's new offense, on May 18, 2011, DCS filed a child in need of services (CHINS) petition. At an initial hearing on June 21, 2011, Mother and Father admitted to the allegations contained in the CHINS petition and the trial court adjudicated the Child to be a CHINS. However, the trial court ordered the Child to remain in Mother's home, and Father to have supervised visits. Mother and Father were required to participate in services. On July 26, 2011, the trial court conducted a dispositional hearing, where it maintained the CHINS status. On October 7, 2011, the trial court, however, determined "the situation that brought about the need for the intervention of [DCS] has been alleviated," and the CHINS case was dismissed. (Exh. Vol. I, p. 7).

[7] On March 27, 2015, DCS received a report that the Child was a victim of neglect after it was determined that the Child had been "re-exposed" to "lead poisoning." (Exh. Addendum p. 28). Family Case Manager (FCM) Eniko

Krizsonveszky was assigned to the case. On April 7, 2015, FCM Krizsonveszky interviewed Mother and Father. During the interview, Mother conveyed to FCM Krizsonveszky that she was residing at 810 E. Virginia, Evansville, Indiana. After the interview, FCM Krizsonveszky created a Safety Plan for the family, and Mother was required to take the Child to Vanderburg County Health Department for monthly blood tests to monitor the Child's lead poisoning. On April 23, 2015, FCM Krizsonveszky contacted Vanderburg Health Department regarding the Child's "new blood test" and was informed that the Child's lead level had gone "up to 29.6 which is very concerning." (Exh. Addendum p. 29).

[8] On June 12, 2015, Mother entered into an Informal Adjustment with DCS. The Informal Adjustment required Mother, among other things, to maintain contact with DCS, maintain suitable and stable housing for the Child, meet the Child's medical and mental health needs, and to take the Child to Vanderburg County Health Department for monthly blood tests to monitor the Child's lead poisoning.

[9] On July 25, 2015, two witnesses reported to DCS that the Child had been struck by Father in the face while attending a derby race at the Vanderburg County Fairgrounds. FCM Leslie Keys (FCM Keys) was sent to investigate the incident. A detective from the Vanderburgh Police Department was also present. FCM Keys learned from witnesses that Father had used his back hand to hit the Child across the face, and overhead Father yell at the Child, "sit the fuck down." (Exh. Addendum p. 73). The witnesses added that Father then

took the Child "to the top of the grandstand[,] and when they returned," the Child "had a laceration on his face." (Exh. Addendum p. 73). FCM Keys asked the Child how he had gotten the bruises on his face, and the Child stated that he had fallen "down on the sidewalk." (Exh. Addendum p. 73). FCM Keys noted that the Child had "bruising on the . . . left and right cheeks, lower back, hips, and bottom, as well as a laceration on the . . . left cheek." (Appellee's App. Vol. II, p. 3). After Father was questioned, he was arrested and later charged with battery.

[10] Because Mother was not at the fairgrounds, DCS took the Child. In an attempt to locate Mother, FCM Keys called Mother's phone but it was not in service. Mother had previously informed DCS that her address was "Econo Lodge on Hwy 41," in Evansville. (Exh. Addendum p. 74). FCM Keys contacted the lodge, but she was informed that Mother and her then-boyfriend, Robert Luizzi, had been "banned" from that location. (Appellee's App. Vol. II, p. 3). Mother later contacted DCS and offered her new address. When another DCS caseworker visited Mother's new address, "the building appeared vacant and no one was present." (Appellant's App. Vol. II, p. 3).

[11] On July 28, 2015, DCS filed a second CHINS petition against Mother and Father. In particular, DCS claimed that Mother had failed to provide suitable or stable housing for the Child. Also, DCS alleged that the "[C]hild's extensive bruising and the witnesses' descriptions of . . . [F]ather's actions leading up to the bruising and laceration indicates that [the] [C]hild's physical or mental

health is seriously endangered due to injury by the act or omission of the [C]hild's parent." (Appellee's App. Vol. II, p. 3).

[12] On September 22, 2015, the trial court held a disposition hearing. On October 2, 2015, the trial court issued a disposition order directing Mother to participate in services designed to reunify her with the Child. The trial court then ordered Mother to participate in any programs recommended by DCS; maintain suitable and stable housing for the Child; and notify DCS in any change of address, employment or contact information. In addition, Mother was required to ensure that the Child's lead levels are checked once a month, and to keep the Child's doctor's appointments. Mother complied with the court-ordered services, and on December 19, 2015, the Child was returned to her care for "a trial home visit." (Tr. Vol. II, p. 107).

[13] On February 18, 2016, the Child's lead poisoning was recorded at "20.9." (Exh. Addendum p. 146). In March 2016, Mother failed to take the Child to the health department for testing. In April 2016, the blood test revealed that the Child's lead poisoning had been raised to "22.8." (Exh. Addendum p. 146).

[14] Regarding housing, in March of 2016, Mother and the Child moved into a home. DCS paid the first month's rent and utility expenses. On April 27, 2016, court-appointed special advocate (CASA) Jade Wade was assigned to the case. In May 2016, Mother was evicted from the home due to non-payment of rent. Prior to Mother's eviction, CASA Wade had visited Mother's home on at least three occasions. During the visits, CASA Wade noted that Mother "was just

always on the run." (Tr. Vol. II, p. 84). Mother would "rush in the kitchen" to get a burger for the Child, and the next moment she and the Child would "rush out of the door." (Tr. Vol. II, p. 84). Following Mother's eviction, Mother and the Child moved into the YWCA shelter. Mother and Child were later evicted from that shelter after spending more than fourteen days away.

[15] When Mother was not being housed by a boyfriend, she would depend on her friends and her mother (Grandmother) for housing. During a certain scheduled visit where Mother had listed Grandmother's address, CASA Wade was in the hallway searching for the correct apartment. CASA Wade heard someone yelling, and as she got closer, she heard Mother telling Grandmother, "[W]e won't be here very long . . . [CASA Wade is] just gonna do a visit." (Tr. Vol. II, p. 79). Based on Mother's statement, CASA Wade concluded that Mother was not residing with Grandmother. During the visit, CASA Wade found Grandmother's home "chaotic." (Tr. Vol. II, p. 79). In another scheduled visit, CASA Wade observed that Grandmother's home was "still very cluttered," there were "unfinished plates of food just laying around," and in "every nook and cranny" there was something. (Tr. Vol. II, p. 79).

[16] Since Grandmother's home was not suitable, in May 2016, DCS referred Mother to Latita Simpson (Simpson), a case worker with the Ireland Home Based Services to address Mother's housing and employment issues. Mother expressed to Simpson that she did not like living in a shelter, so Simpson identified a couple of apartments on the southside of Evansville, but Mother either rejected the "neighborhood" or stated that "she knew somebody" in the

apartment complex "that didn't like her." (Tr. Vol. II, p. 40). DCS also connected Mother with Aurora, an organization that would work with Mother "for like six months and they would pay" 80% of Mother's rent and utilities; but Mother was required to work. (Tr. Vol. II, p. 77). Mother failed to comply with Aurora's main stipulation of employment and it appears that Mother's reluctance in obtaining a home was primarily because she was being housed by her then-boyfriend, Brandon LaForest (LaForest).

[17] Mother's employment history, like her residential history, displayed a lack of stability and focus on the Child's needs. Mother is a mechanic, and she expressed to Simpson that she "did not want to give up her dream of being a mechanic . . . and give up making less than $11.00 an hour." (Tr. Vol. II, p. 50). Simpson encouraged Mother to apply for other non-mechanic jobs in the interim, but Mother failed to comply.

[18] In August 2016, the Child was enrolled in kindergarten. The Child's behavior at school was "impulsive and violent." (Exh. Addendum p. 145). Shortly after his enrollment, the Child was kicked out of "[A]fter School Care for being physically aggressive toward other students and staff." (Exh. Addendum p. 145). On September 7, 2016, the Child was suspended from "school for kicking another student and hitting two other students during gym class." (Exh. Addendum p. 14). The Child also punched another student "with his hands." (Exh. Addendum p. 146).

[19]	The next day, on September 8, 2016, Child was admitted at the Harsha Behavioral Center in Evansville, Indiana, because:

> Today he was violent at school. [P]unched a female student. She was sent to the hospital because of her injuries. He has been biting, hitting, and head butting. He finds his behaviors funny. He wraps things around his throat daily. He hallucinates that he sees his dead step father (died 2/16/16).[3] [Paternal] Grandmother died in [M]arch of this year. His behaviors have been going on for over a year but have been worse since the deaths in the family. He was physically abused by [Father] and he no longer has contact with him.

(DCS Ex. 8, p. 11). While admitted at the center, the Child underwent a psychiatric evaluation and he was diagnosed with Disruptive Mood Dysregulation Disorder (DMDD), and unspecified Attention-Deficient Hyperactive Disorder (ADHD). On his third day at the center, the Child continued to exhibit "rude and defiant" behavior. (Appellant's App. Vol. II, p. 114). The Child lacked "discipline skills" and he had "multiple visits to the quiet room" since he kicked and bit the staff and his peers. (Appellant's App. Vol. II, p. 114). By day five, the Child exhibited less aggression and he interacted well with others.

---

[3] This is E.B.'s father.

[20] On September 14, 2016, the Child was discharged from the Harsha Behavioral Center. DCS simultaneously filed a motion to modify the October 2015 dispositional order, arguing that Mother "is currently unable to provide appropriate care and supervision, because Mother does not have stable housing or employment and cannot protect [the Child] from harming others or himself." (Appellee's App. Vol. II, p. 11). As such, DCS requested that the Child be placed in foster care. The Child was later enrolled in another school, and he is in an "emotional disabilities class . . . due to his behavioral. . . and emotional disabilities." (Tr. Vol. II, p. 25). At his new school, the Child has an Individualized Educational Plan (IEP), and he is seen by two therapists for his behavioral issues.

[21] On September 27, 2016, DCS filed a progress report referring Mother to attend weekly supervised visits with the Child through Ireland Home Based Services. Also, Mother was required to work with Ireland Home Based Services in establishing a stable and safe home for the Child.

[22] On September 29, 2016, DCS filed a report with the trial court recommending that Mother undergoes a psychological assessment after Mother reported that she suffers from anxiety. DCS also recommended Mother's current boyfriend, LaForest, be ordered to participate in services offered by DCS because the Child "refers to [LaForest] as Dad." (Exh. Addendum p. 152) (internal quotation marks omitted). Mother was also required to obtain housing for herself and the Child.

[23]     On November 1, 2016, the trial court conducted a periodic review hearing, and on January 5, 2017, the trial court once more ordered Mother to be consistent with DCS services, obtain housing, be gainfully employed, attend to the Child's medical needs, and keep up with supervised visitations. Based on Mother's continued disinterest in obtaining housing and a job, DCS "closed" the home-based services in March 2017 since "Mother would miss sessions . . . and was not open to living in . . . areas which limited her housing selection." (Exh. Addendum p. 156). On March 16, 2017, DCS filed a report with the trial court, again mentioning the need for Mother to undergo a psychological evaluation, and to find a suitable home for herself and the Child.

[24]     In July 2017, Mother completed a psychological evaluation and was diagnosed with Post-Traumatic Stress Disorder (PTSD). Based on Mother's diagnosis, DCS referred Mother to Southwestern Behavioral Healthcare for an assessment. The assessment revealed that Mother was depressed, and Mother was required to attend monthly therapy sessions. The therapist at Southwestern Behavioral Healthcare attempted to contact Mother to schedule an appointment, but Mother failed to return her call.

[25]     On September 26, 2017, DCS filed a petition to terminate the parental rights of Mother and Father. On January 31 and February 5, 2018, the trial court conducted a factfinding hearing on DCS' petition. At the time of the hearing, Mother was unemployed and had failed to maintain stable housing for herself and the Child. During the hearing, DCS, and CASA Wade all opined that termination of Mother's parental rights was in the Child's best interests. On

April 3, 2018, the trial court issued finding of facts and conclusion thereon terminating Mother's and Father's parental rights.

[26] Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## A. *Standard of Review*

[27] Mother appeals the trial court's termination of her parental rights. A parent has an "interest in the care, custody, and control of his or her children [that] is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). The Fourteenth Amendment to the United States Constitution thus safeguards "the traditional right of parents to establish a home and raise their children." *Id*. Nevertheless, it is well established that "parental rights are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1122 (Ind. Ct. App. 2013) (internal quotation marks omitted) (quoting *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010)). Termination of parental rights is appropriate where "parents are unable or unwilling to meet their parental responsibilities." *In re G.Y.*, 904 N.E.2d at 1259-60. We appreciate that the termination of a parent-child relationship is "an extreme measure and should only be utilized as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and

child have failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

[28]   Upon review of a trial court's termination of parental rights, our court does not reweigh evidence or assess the credibility of witnesses. *In re G.Y.*, 904 N.E.2d at 1260. Rather, we "consider only the evidence and reasonable inferences that are most favorable to the judgment." *Id*. Additionally, the trial court issued specific findings of fact and conclusions thereon, which requires application of the two-tiered standard of review set forth in Indiana Trial Rule 52(A): "[f]irst, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *Id*. We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). A trial court has clearly erred "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re G.Y.*, 904 N.E.2d at 1260 (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005))

II.   *Termination of Parental Rights Statute*

[29]   In order to terminate a parent's rights to her child, DCS must prove:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

\* \* \* \*

(iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. C.*A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to 'be highly probable.'" *Id.*

*A. Remediation of Conditions*

[30]   In considering whether there is a reasonable probability that conditions will not be remedied, we must identify what conditions led to the Child's "placement and retention" outside of the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). In making these decisions, "the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (internal quotation marks omitted) (quoting *Bester*, 839 N.E.2d at 152; *K.T.K.*, 989 N.E.2d at 1231). "Habitual conduct may include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability that the parent's behavior will not change." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (internal quotation marks omitted), *trans. denied*.

[31]   Turning to our first step analysis, the conditions led to the Child's placement and retention outside of the home, the record shows that on September 7, 2016, the Child was suspended from "school for kicking another student and hitting two other students during gym class." (Exh. Addendum p. 14). The Child also punched another student "with his hands." (Exh. Addendum p. 14). One

those students had to go to the ER for treatment. Based on these violent incidents, the following day, the Child was admitted at Harsha Behavioral Center and he remained there for about eight days. After the Child was released from the center, DCS simultaneously filed a motion to modify the October 2015 dispositional order, arguing that Mother "is currently unable to provide appropriate care and supervision, because Mother does not have stable housing or employment and cannot protect [the Child] from harming others or himself." (Appellee's App. Vol. II, p. 11). DCS therefore requested that the Child to be placed in foster care.

[32] Mother argues that the trial court's finding that she had an unstable home is erroneous because she had "maintained stable housing for the eight months prior to the termination" of her parental rights, "albeit with [Harold Blackard (Blackard)] and his children." (Appellant's Br. p. 9). Mother further argues that she "had always managed to not become homeless by staying with [a] boyfriend or [a] roommate." (Appellant's Br. p. 9).

[33] With regards to Mother's housing, the trial court issued the following pertinent findings:

> 10. During the CHINS matter, [M]other was offered parent aid [sic] services to help with scheduling, budgeting, and maintaining housing. Mother did attend at the outset of the service, but states that she stopped attending sessions because they became stressful and confusing. Mother missed approximately 30% of her appointments with the parent aid [sic] and the service was discontinued as a result.

11. Mother listed numerous places where she has resided both with and without the [C]hild since [DCS'] intervention. DCS was able to count approximately ten residences that were reported during the pending CHINS matter. Mother has had repeated difficulties with being able to pay rent and utilities needed to maintain stable housing. At one home, even after [DCS] provided financial assistance with a deposit, rent, and the electric arrearage in March of 2016, [M]other was [] evicted by May of 2016 due to her inability to maintain the rent. The court notes that [M]other has had this financial difficulty despite also reporting numerous different types of employment over the years.

12. Mother completed multiple budgets with her parent aid [sic] when she did work with the parent aid [sic]. Mother reported to the parent aid [sic] that she couldn't save money. Despite always reporting employment, [M]other did not often provide verification. Even while living with others who assisted with costs, [M]other never seemed to have money left to pay for needed items. Even when rent and daycare were not included in the budgets [M]other completed, she still did not have enough money to meet expenses.

13. Mother and child resided at the YWCA shelter for a period of time. Mother had the opportunity to remain at the YWCA shelter with the [C]hild while she established herself but absented herself from their program and stated thereafter that she would not go back to [the] shelter. Mother was also provided the opportunity to work with Aurora, a housing assistance program located in Evansville, but did not follow through with them.

14. Mother now believes that she has stable housing. Mother resides with [Blackard] and does not own the home where she resides. The [c]ourt notes that based on the evidence, [M]other has lived with other significant others on multiple occasions who were able to help her maintain shelter for a period of time. Each of those situations ultimately turned out to be temporary and did not lead to an appropriate and stable long-term housing situation for [M]other and the [C]hild. The court finds additional concern with the fact that [M]other's significant other[,Blackard,] also has a history of domestic violence.

****

> 16. Based on the evidence before the court, the court finds that mother is not likely to remedy the reasons that the [C]hild has remained out of her care . . . . Mother was given the opportunity to have housing for herself with assistance from DCS, or at a shelter where more supports would have been available, but she did not take advantage of those circumstances . . . .

(Appellant's App. Vol. II, pp. 13-15).

[34] Our review of the record reveals that at the time the Child was removed from Mother's care in September 2016, Mother was without stable housing and had been staying at random locations with the Child without informing DCS of their location. One of the locations was LaForest's house—Mother's then boyfriend. While it is unclear when Mother ended her relationship with LaForest, sometime after August of 2017, Mother began dating Blackard and she thereafter moved in with him. Blackard has three teenage children living with him, and "two little boys" that are close to the Child's age. Blackard's minor children sometimes visit on the weekends. (Tr. Vol. II, p. 136).

[35] When asked if she would consider Mother's housing of "a few months" with Blackard as satisfactory, CASA Wade first pointed out that the trial court had "excluded" Blackard from participating in the services offered by DCS. (Tr.

Vol. II, p. 86).[4] CASA Wade added that in August 2017, Mother had claimed that the Child had his own bed. However, in January 2018, just a few days before the termination hearing, CASA Wade visited Blackard's home and there was a "brand new bunk bed." (Tr. Vol. II, p. 86). Despite Mother's statement that the Child had a bed in Blackard's home in 2017, CASA Wade opined that it was "apparently [] a lie, because they're brand new right now. The mattresses weren't even on the bed. [Mother] tells you a lot of times what she thinks you want to hear." (Tr. Vol. II, p. 86).

[36] FCM Stephanie Kingston (FCM Kingston) estimated that Mother had resided in at least ten different homes during these proceedings. FCM Kingston testified that at some point, Mother had resided "with a guy named [LaForest] for quite some time" and when Mother broke up with LaForest, she moved in with Blackard. (Tr. Vol. II, p. 114). FCM Kingston additionally stated that Mother's unemployment prevented her from obtaining housing by herself, and that is why Mother "was always living with somebody that would help her pay the bills. But then if somethin' happened she was homeless again." (Tr. Vol.

[4] At a pretrial hearing conducted on November 14, 2017, the trial court ordered Blackard to be "excluded for placement" and to "remain outside the court room for future proceedings." (Appellees' App. Vol. II, p. 26).

II, p. 115). When asked how the unstable housing impacted Mother's ability to care for the Child, FCM Kingston stated,

> I feel like . . .[Mother] has moved from different homes with different people that were not DCS approved, that have felonies, she just can't provide stability for [the Child]. And [the Child] needs a structured home. Like we've all stated numerous times today, [the Child] needs a structured home with his behavior. Any different kind of routine throws him off. So if you can't provide stability and live in a home for long periods of time, it's just really hard to put [the Child] back with [Mother].

(Tr. Vol. II, p. 115). We have previously explained that "the time for parents to rehabilitate themselves is during the CHINS process, prior to the filing of the termination petition." *Prince v. Dep't of Child Servs.*, 861 N.E.2d 1223, 1230 (Ind. Ct. App. 2007). Further, we emphasize that it is the responsibility of the parent—and the parent alone—to make the changes necessary to remedy the conditions that warranted DCS' intervention. *Id.* at 1231.

[37] Despite a wealth of services available to her during the CHINS process, Mother failed to successfully accomplish two major goals. At the time of the termination hearing, Mother was unemployed, and it was unclear whether her living arrangement with Blackard was temporary or permanent. CASA Wade testified that Mother "has never taken it upon herself to have a home of her own. It's always been dependent on what man she was with at the time." (Tr. Vol. II, p. 77). The record additionally shows that Mother's current boyfriend, Blackard, was convicted of domestic battery and strangulation in 2014, and even though Mother had established housing with Blackard prior to the

termination hearing, CASA Wade testified that Blackard had been excluded from participating in the CHINS case, and that consequently meant that his home was not considered appropriate for the Child's placement.

[38]     Although we recognize that Mother did participate in some services and attended supervised visits with the Child, "where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). In sum, the Child was removed from Mother's care partly because she had unstable housing. During the CHINS case, Mother failed to take meaningful steps to meet her parental responsibility. Accordingly, we find ample support in the record for the trial court's determination that the conditions resulting in Child's removal or the reasons for placement outside her home will not be remedied.

### B. Best Interests of Child

[39]     Mother also challenges the trial court's finding that termination of her parental rights is in the Child's best interests. The parent-child relationship is "one of the most valued relationships in our culture." *Bester*, 839 N.E.2d at 147 (quoting *Neal v. DeKalb Cnty. Div of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Thus, the purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*. When considering whether termination would be

in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. "The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *K.T.K.*, 989 N.E.2d at 1235. Permanency is a central consideration in determining a child's best interests. *Id*. Nevertheless, "the right of parents to raise their children should not be terminated solely because there is a better home available for the children." *In re K.S.*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001).

[40] Mother's behavior during these proceedings made it clear that she could not meet Child's medical needs. DCS became involved after the Child was re-exposed to lead poisoning in March 2015. Mother subsequently entered into an Informal Adjustment and was required to take the Child to the Vanderburg Heath Department on a monthly basis to have the Child's blood tested for lead poisoning. The record is replete with Mother missing these monthly check ups. Also, after the Child was diagnosed with unspecified ADHD, and DMDD, he was prescribed Vyanse, Kapvay, Zyprexa and Clonidine. These medicines are taken at specific times during the day. Mother admitted that she was not aware of the Child's medication regimen. In addition, the Child suffers from behavioral issues which require therapy. The record shows that Mother missed attending several therapy sessions while the Child was in her care, and she missed other appointments while the Child was in foster care.

[41] At the time of the termination hearing, Mother was unemployed, and it was unclear whether her living arrangement with her current boyfriend, Blackard, was temporary or permanent. The Child was thriving in his current foster placement, and Foster Mother was meeting all of the Child's medical needs. Although Foster Mother did not plan on adopting the Child, CASA Wade testified that DCS already has received applications from potential families willing to adopt the Child. Referring to adoption and the need for permanency, CASA Wade opined that the Child "needs continuity, he needs stability, he needs to get in a household. He's gonna be 7. This has been goin' on 7 years of his life already. He's gonna be a teenager and you want to try to get him into being a loving boy. You don't wanna see a teenager with these behaviors. You want to get it resolved and let him have a few years in a loving environment." (Tr. Vol. II, p. 88). *See McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003) (holding that the testimony of the child's CASA is sufficient to support the trial court's conclusion that termination is in the child's best interests.)

[42] Mother testified that she now knows what it takes to be a fit Mother, and she listed her responsibilities as follows: to take the Child to all his doctor's appointments, to strictly follow the Child's diet due to the lead poisoning, and finally, attend her own therapy sessions. When asked how long she has been aware of these obligations, Mother stated that she has known that "for a while." (Tr. Vol. II, p. 135).

A court is not required to place children on a shelf until parents are capable of caring for them properly. *See In re Campbell*, 534 N.E.2d 273, 275 (Ind. Ct. App. 1989). The record shows that Mother has failed to demonstrate that she can provide permanency and a stable home for the Child, and that termination of Mother's parental rights will allow the Child to be adopted into a stable and permanent home where his needs will be safely met. Thus, we find ample evidence to support the trial court's determination that termination of Mother's parental rights is in the Child's best interests.

# CONCLUSION

Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's order terminating Mother's parental rights to the Child.

Affirmed.

Vaidik, C. J. and Kirsch, J. concur